IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **RYLEN WALKER** | CASE NO. |
| *Plaintiff*, | |
| **v.** | |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION** | **COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF** |
| *Defendant.* | |

Petitioner, RYLEN WALKER ("**Petitioner**"), appearing through undersigned counsel, asserts this action against Defendant, the NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("**NCAA**"), averring as follows:

## SUMMARY OF THE ACTION

1.      This action seeks declaratory and injunctive relief to prevent the NCAA from enforcing certain eligibility rules that unlawfully prevent Petitioner from participating in NCAA Division II basketball during the 2025-2026 season, in violation of federal antitrust laws.

2.      Petitioner specifically challenges NCAA Division II Bylaw 14.4.3 and 14.4.3.2 (the "10-Semester/15-Quarter Rule") and Bylaw 14.02.12 (the "Intercollegiate Competition Rule") which restrict the ability of Petitioner and other former two-year junior college ("JUCO") athletes to fully utilize their NCAA eligibility. Under the 10-Semester/15-Quarter Rule and the Intercollegiate Competition Rule (collectively the "JUCO Eligibility Limitation Bylaws"), time spent competing for a JUCO—even though such institutions are not part of the NCAA and their student-athletes thus receive none of the NCAA's benefits—count as "intercollegiate competition" and, therefore, start the student-athlete's four season "Eligibility Clock." Thus, the JUCO Eligibility Limitation Bylaws arbitrarily limit participation time and create unequal standards for

1

student-athletes who begin their careers at non-NCAA institutions, discouraging student-athletes from attending JUCOs to prepare for four-year colleges and to punish those who do so, even though JUCOs may provide such student-athletes with necessary academic and other opportunities.

3.      These JUCO Eligibility Limitation Bylaws also deprive Petitioner and other former JUCO athletes of access to name, image, and likeness ("NIL") compensation and scholarship opportunities directly tied to their participation as NCAA Division II athletes, thereby creating a commercial barrier in violation of federal antitrust law.

4.      Despite the NCAA recently issuing a blanket waiver extending eligibility for former JUCO athletes to compete in the 2025-2026 academic year for NCAA *Division I* institutions (in response to the ruling in *Pavia v. NCAA* discussed herein), the NCAA has refused to provide equivalent relief to former JUCO athletes to compete for NCAA *Division II* institutions next year. This refusal exacerbates the existing inequity and further suppresses competition in the student-athlete labor market.

5.      Petitioner has more than reasonable probability of success on the merits of the factual allegations contained in this Complaint.

6.      Far from promoting competition or benefiting student-athletes, these JUCO Eligibility Limitation Bylaws actively suppress it, distorting the labor market for college basketball players, diminishing athlete welfare, and weakening the quality of play available to the public. The rules directly conflict with the NCAA's stated mission of supporting athlete well-being and constitute precisely the kind of anti-competitive restraint the antitrust laws are designed to prohibit. For Petitioner (and similarly situated Division II student-athletes), the window to compete at the NCAA Division II level is rapidly closing and, absent judicial intervention, these NCAA mandated limitations will cause irreparable harm to his athletic career.

2

7.      Unless enjoined, the effect of the NCAA's anti-competitive conduct will result in Petitioner being punished and penalized for having attended JUCO. It will also permanently deprive him of a once-in-a-lifetime opportunity to profit from his NIL and the opportunity to enhance his career and reputation by playing another year of Division II basketball. Additionally, this will harm Petitioner's lifetime of hard work in the classroom and on the basketball court that he has pursued to even be considered for these opportunities. The NCAA's anti-competitive conduct is resulting in irreversible damage. This conduct threatens him with immediate irreparable harm with no solution and, absent the issuance of a preliminary injunction in this matter, Petitioner will experience irreparable harm.

8.      Absent injunctive relief, Petitioner would plainly suffer irreparable harm as he would be denied the opportunity to compete in NCAA Division II basketball, to secure a scholarship necessary to allow him to complete his degree, and to purpose NIL afforded to NCAA athletes.

9.      Accordingly, Petitioner respectfully seeks a preliminary and permanent injunction against the enforcement of the JUCO Eligibility Limitation Bylaws and an order declaring that these rules violate antitrust law that Petitioner is eligible to compete in Division II basketball in the 2025–2026 season.

## **THE PARTIES**

10.      Petitioner is a resident and domiciliary of Baton Rouge, Louisiana. For the past two seasons, he has played NCAA Division II college basketball at Miles College in Fairfield, Alabama. Prior to enrolling and playing basketball at Miles College, Petitioner played two seasons of JUCO basketball: one season at Mississippi Delta Community College and one season at Hinds Community College.

3

5298536

**11.** The NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA membership includes more than 1,100 four-year colleges and universities throughout the United States, including institutions in the Middle District of Louisiana. The NCAA has its principal place of business and may be served with legal process at 700 West Washington Street, Indianapolis, Indiana, 46206.

## JURISDICTION AND VENUE

**12.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this case arises under federal antitrust law, specifically Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 26 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**13.** This Court has jurisdiction to grant injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**14.** This Court has personal jurisdiction over the NCAA because it conducts substantial business in this District, including but not limited to sanctioning intercollegiate athletic events, entering contracts with member institutions, and generating revenue through television broadcasts, ticket sales, and merchandising activities involving schools located in this District.

**15.** Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2) because the NCAA transacts business in this District.

## BACKGROUND

**16.** In *NCAA v. Alston,* a unanimous U.S. Supreme Court ruled that the NCAA's rules (restricting the education-related compensation and benefits that NCAA member school could make available to student-athletes) violated antitrust law, which helped pave the way for college athletes to receive compensation for use of their names, images, and likenesses ("NIL Compensation"). *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021) ("*Alston*").

17.     The market realities of college sports have changed tremendously over the last 40 years, which has led to the Supreme Court characterizing the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year. *Alston*, 594 U.S. at 79, 93. For instance, from 1982 to 1984, CBS Broadcasting Inc. paid $16 million per year to televise the March Madness Division I men's basketball tournament. *Alston*, 594 U.S. at 93. In 2016, those annual television rights increased to $1.1 billion. *Id*. As a result, the NCAA is no longer arguably entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restrains of trade." *Id*. at 94. Experts have stated that the NCAA exercises "monopsony power in this market." *Elad v. National Collegiate Athletic Ass'n*., 3:25-cv-019181-ZNQ-JTQ, U.S. Dist. Ct. of N.J., Opinion (April 25, 2024) ("*Elad*") (citing *Alston*). *See* **Exhibit A** – the New Jersey Federal District Court's *Elad* opinion (p. 4).

18.     Within days of the Supreme Court's decision in *Alston*, on July 1, 2021, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation opportunities. In the nearly four years since, the market for NIL Compensation opportunities available to NCAA athletes has exploded. *See* **Exhibit B**—NIL-AT-3-The Annual Opendorse Report (p. 4). Significantly, those NIL Compensation opportunities are only available to NCAA athletes—not JUCO athletes.

19.     Student athletes playing basketball outside of the NCAA monopoly have no meaningful opportunity to profit from their NIL. Thus, athletes who begin their basketball careers at JUCOs are effectively denied meaningful opportunities to profit from their NIL as a result of this non-NCAA athletic participation.

20.     The NCAA's eligibility rules at issue here—the JUCO Eligibility Limitation Bylaws—impose unlawful restrictions with substantial anti-competitive effects, particularly on two-year JUCOs that fall outside NCAA membership opportunities. Under current NCAA Division

II rules, athletes who begin their collegiate basketball careers at JUCOs are restricted to only two or three seasons of NCAA Division II basketball, as opposed to the four seasons of competition (and NIL Compensation opportunities) afforded to NCAA Division II basketball players who began their careers at NCAA member institutions.

21.     The NCAA has also historically disadvantaged JUCO athletes by limiting their opportunities and imposing additional academic hurdles on those seeking to transfer to an NCAA institution. For instance, under the current NCAA Division II rules, JUCO student-athletes transferring to a NCAA Division II institution must have a minimum GPA of 2.2 in transferable credit hours in order to be eligible to immediately practice, get an athletics scholarship, and compete at the NCAA Division II school. *See* **Exhibit C**—NCAA Guide for Two-Year Transfers 2024-2025 (p. 13). However, student-athletes transferring between NCAA institutions are only required to have a minimum GPA of 2.0  *See* **Exhibit D**—NCAA Guide for Four-Year Transfers 2024-25 (p. 12).

22.     Under the facts and law set forth herein, Petitioner respectfully requests that this Honorable Court issue injunctive and declaratory relief sought to preserve the status quo and prevent the irreparable harm that will result to Petitioner and to put a stop to the unjustified anti-competitive restriction on Division II institutions that seek to compete for student-athletes, and to restore freedom of economic opportunity for himself and other NCAA Division II basketball players.

## FACTUAL ALLEGATIONS

### A.  THE NCAA

23.     The NCAA is a voluntary, self-governing association of approximately 1,100 four-year colleges and universities throughout the United States that administers athletic competition

for student-athletes. See *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 79, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021); *Pavia*, 760 F.Supp.3d 527 at 2.

24.     As the NCAA acknowledged in *NCAA v. Alston*, 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for student-athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

25.     Excluded from NCAA membership are JUCOs, many of which are members of the National Junior College Athletic Association ("NJCAA"), an organization designed to promote, govern, and foster a competitive environment for JUCO athletics.[1] The NJCAA has no affiliation with the NCAA. See *Pavia v. NCAA*, No. 3:24-cv-01336 (M.D. Tenn. Dec. 18, 2024), *9 n.5.

26.     The NCAA is divided into three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. These rules include those that determine the eligibility of student-athletes to participate in intercollegiate athletics. Through its complex web of bylaws, the NCAA exercises plenary control over virtually every aspect of NCAA athlete eligibility and competition.

27.     As a practical matter, an academic institution that wishes to participate in any meaningful way in collegiate athletics must maintain membership in the NCAA and abide by the rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

_____

[1] *See* https://www.njcaa.org/about/mission/Mission statement.

28.    It is the NCAA's mission to "provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience....The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body." **Exhibit F**—Division II, 2024-25 Manual, Preamble. In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

**B. THE RELEVANT NCAA JUCO ELIGIBILITY LIMITATION RULES.**

29.    Of relevance to this action are two eligibility rules codified in the Division II 2024-2025 Manual (the "Bylaws") that have the effect of discriminating against JUCOs by discouraging and penalizing student-athletes who attend them, like Petitioner.

30.    The *first* is the 10-Semester/15-Quarter Rule. This rule forbids a student-athlete from competing for a Division II school in more than four seasons of "intercollegiate competition" within the first 10 semesters or 15 quarters in which the student is enrolled in a "collegiate institution." More specifically, Bylaws 14.4.3 and 14.4.3.2 provide, in pertinent part:

> **14.4.3 Seasons of Competition: 10-Semester/15-Quarter Rule**. A student-athlete shall not engage in more than four seasons of *intercollegiate competition* in any one sport (see Bylaws 14.02.12 and 14.4.3.2). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all of their seasons of participation in all sports within the time periods specified below:

> **14.4.3.2 Ten-Semester/15-Quarter Rule**. A student-athlete shall complete their seasons of participation during the first 10 semesters or 15 quarters in which the student is enrolled in a *collegiate institution* in at least a minimum full-time program of studies, as determined by the regulations of that institution….

**Exhibit F** (emphasis added).

31.    Thus, the athlete's 10-semester window within which the athlete must complete the allowed four seasons of "intercollegiate competition" is known as an "Eligibility Clock," which

starts to run from the date the athlete registers as a full-time student at any "collegiate institution," whether or not such institution is a member of the NCAA.[2] **Exhibit F.**

32.    The NCAA's "Guide for Two Year Transfers" has a section on the Eligibility Clock, wherein it explains that the purpose of the ten-semester window is to "move student-athletes toward graduation in a timely manner." **Exhibit C**—NCAA Guide for Two Year Transfers 2024-25 (p. 21). Thus, the NCAA concedes that the 10-semester window is not designed for any pro-competitive purpose.

33.    The second eligibility rule is the Intercollegiate Competition Rule. Although JUCOs are excluded from the NCAA, this rule defines "intercollegiate competition" to include competition at either "a two-year or a four-year collegiate institution." More specifically, Bylaw 14.02.12 provides, in pertinent part:

> **14.02.12 Intercollegiate Competition.** Intercollegiate competition *occurs* when a student-athlete in either a <u>*two-year*</u> or a four-year collegiate institution:
>
> (a) <u>*Represents the institution in any contest against outside competition*</u>, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies….

**Exhibit F** (emphasis added).

34.    Therefore, while JUCOs are not part of the NCAA monopoly (and JUCO athletes have no meaningful opportunity to earn NIL Compensation), the NCAA still subtracts one season of NCAA Division II eligibility from an athlete for each year the athlete competes at a JUCO.

---

[2] A "collegiate institution" is defined in Bylaws section 14.02.5 as an "institution of higher education" that, in relevant part: "[i]s accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree." This definition includes JUCOs.

C. *PAVIA* AND THE NCAA'S "BLANKET WAIVER" EXTENDING DIVISION I ELIGIBILITY.

35.    Notwithstanding these limitations, the NCAA maintains the discretion to waive application of the JUCO Eligibility Limitation Rules to enable college athletes to compete for NCAA member institutions.

36.    The NCAA has provided blanket waivers of these Rules to institutions in light of certain events. One such blanket waiver was granted to NCAA institutions due to the COVID-19 pandemic, which waiver permitted institutions to self-apply a waiver of the 10-Semester/15-Quarter and Intercollegiate Competition Rules for the 2020-2021 season.[3]

37.    The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. Dec. 18, 2024).

38.    Like Petitioner in the instant case, Diego Pavia (the quarterback for Vanderbilt University—a Division I school) challenged the NCAA's Division I eligibility rules pertaining to JUCO transfers (the "Five-Year Rule" and "Intercollegiate Competition Rule"),[4] which require Division I student-athletes to complete the maximum four seasons allowed within a five-year period that begins on the student's first day of classes at a "collegiate institution" – which includes non-NCAA institutions, such as JUCOs.

39.    In *Pavia*, the court granted a preliminary injunction on December 18, 2024, prohibiting the NCAA from (a) counting a year that Pavia spent playing football at a JUCO as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring

_____

[3] *See* https://www.ncaa.org/news/2020/7/22/dii-approves-season-of-competition-eligibility-relief-for-2020-21.aspx
[4] The NCAA Division I Bylaws challenged in *Pavia* are nearly identical to the NCAA Division II Bylaws challenged by Petitioner herein.

5298536

Pavia, who had otherwise played just three years of Division I college football, from playing for

Vanderbilt in the 2025-2026 season.

      **40.**    The court in *Pavia* found an injunction appropriate due to the clear anticompetitive

effects the NCAA's interpretation of the Intercollegiate Competition Rule—*i.e.*, by counting

Pavia's year of JUCO football as a season of competition—would have on JUCO and college

athletes:

> First, the challenged rules limit the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.

> The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.

> NCAA Division I member institutions compete directly with NJCAA schools for football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.

> In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

*Pavia*, at 22-23.

41.    On December 23, 2024—just five days after the *Pavia* ruling—the NCAA provided a blanket waiver (the "*Pavia* Waiver") of the Intercollegiate Competition Rule to any college athletes who (i) competed for a JUCO; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a JUCO; and (iii) met all other eligibility criteria. Thus, the NCAA's *Pavia* Waiver granted an additional year of eligibility to student-athletes who previously attended and competed at a non-NCAA institution, thereby allowing such athletes to remain eligible and compete in **Division I** athletics during the 2025-2026 academic year (provided they would have otherwise exhausted their eligibility in the 2024-2025 and met all other NCAA requirements).

42.    The *Pavia* Waiver for the 2025-2026 academic year is only available to college athletes that compete for NCAA **Division I** institutions—not college athletes that compete for Division II (like Petitioner) or Division III institutions.

43.    Like Pavia and Petitioner, Jett Elad (a football player enrolled at Rutgers University—a Division I school) also challenged the NCAA Bylaws (the "Five-Year Rule" and "Intercollegiate Competition Rule") that restrict the duration of a student-athlete's eligibility to compete in four seasons within a five-year period. And like the court in *Pavia*, the New Jersey federal court in *Elad* found that the NCAA rules likely violated antitrust laws by unfairly restricting the student-athlete's ability to compete and by counting JUCO seasons towards the eligibility clock when JUCOs are not governed by the NCAA and that denying Elad eligibility would result in irreparable harm.

44.    Upon information and belief, the NCAA recognized that its *Pavia* Waiver was inapplicable to Division II competition and considered a proposal (similar to the *Pavia* Waiver applicable to Division I competition) that would grant a blanket eligibility waiver to student-

athletes who previously played at a JUCO to compete in Division II athletics during the 2025-2026 academic year. However, despite the Bylaws for Division I and Division II containing the same unlawful limitations on former JUCO student-athletes eligibility, the NCAA has declined to grant the same eligibility relief for Division II competition next year that it granted for Division I. **Exhibit G**—NCAA Division II Management Council and Executive Board Summary of Actions, Winter 2025 Meeting.

45.     As a result, a Division II student-athlete in Petitioner's position is only eligible for an additional year of NCAA competition next season if the athlete leaves his or her current Division II school to transfer to a Division I school.[5]

**D.  JUCO ELIGIBILITY LIMITATION BYLAWS' APPLICATION TO PETITIONER.**

46.     Petitioner was a three-year starter on the Central High School varsity basketball team in Baton Rouge, Louisiana, and was twice named to the 1st Team All-Area. **Exhibit E** – Declaration of Rylen Walker.

47.     After graduating from Central High School in 2021, Walker enrolled at Mississippi Delta Community College, a JUCO in Moorehead, Mississippi, and played college basketball during the 2021-2022 academic year. **Exhibit E** – Declaration of Rylen Walker.

48.     After the 2021-2022 academic year, Petitioner transferred to Hinds Community College, a JUCO in Utica, Mississippi, where he played college basketball during the 2022-2023 academic year and obtained an associate's degree. **Exhibit E** – Declaration of Rylen Walker.

_____

[5] This is also true for Division III student-athletes, as the NCAA has not granted a waiver for Division III athletics next year either. As a result, Division II and Division III student-athletes who previously attended JUCO are forced to enter the NCAA Transfer Portal (which automatically results in the loss of the athlete's scholarship at their current institution) and try to obtain a scholarship offer from a Division I institution.

49.     Following the 2022-2023 academic year and after playing two years of JUCO basketball, Petitioner transferred to Miles College, a NCAA Division II member school. Walker received an athletic scholarship that covered the full cost of tuition and room and board, and he played college basketball for Miles College for two seasons (during the 2023-2024 and 2024-2025 academic years). **Exhibit E** – Declaration of Rylen Walker.

50.     At the conclusion of the 2024-2025 academic year, Petitioner was advised that he had exhausted his NCAA eligibility, and, therefore, was ineligible to play basketball at Miles College.  **Exhibit E** – Declaration of Rylen Walker.

51.     At the end of the Spring 2025 semester, Petitioner was 20 credit hours short of obtaining his bachelor's degree in business. Petitioner is presently enrolled in six hours in the Summer 2025 semester at Miles College at his own cost. **Exhibit E** – Declaration of Rylen Walker.

52.     Based on the NCAA Division II Board of Director's decision not to grant an extension of eligibility, Petitioner entered the NCAA Transfer Portal in an attempt to transfer to a Division I institution to play another season of college basketball while completing his degree requirements. **Exhibit E** – Declaration of Rylen Walker.

53.     During discussions with one Division I institution, Petitioner was advised that only 67 of his 111 earned credit hours would transfer to that institution, making it impossible for him to obtain a degree in what would be his remaining year of eligibility. Additionally, the credit hours would only go toward a degree in sociology, not a business degree that he is currently pursuing. **Exhibit E** – Declaration of Rylen Walker.

54.     The NCAA permits only member institutions (*i.e.*, four-year institutions), conferences, or committees/subcommittees—not individual athletes—to file and seek waivers to

address specific circumstances that may impact an athlete's eligibility. See **Exhibit F**, p. 22 ("Important NCAA Terms").[6]

54.    Under the circumstances, Petitioner and his attorney have requested that Miles College assist Petitioner by formally filing a waiver request so that the NCAA can exercise its discretion to waive the JUCO Eligibility Limitation Rules as they apply to Petitioner.

56.    Petitioner was advised that his institution was unable to file a waiver on Petitioner's behalf because he was not currently on the roster due to the JUCO Eligibility Limitation Rules.

57.    Petitioner's inability to seek assistance from the NCAA directly is yet another example of the NCAA erecting procedural barriers that disproportionately burden JUCO athletes, effectively impeding their ability to access or exhaust available remedies if their school is unable or unwilling to assist them.

58.    Absent relief from this Court, Petitioner will be precluded from completing his degree requirements while receiving an athletic scholarship to play NCAA Division II basketball.

59.    Applied collectively, the JUCO Eligibility Limitation Bylaws violate Section 1 of the Sherman Act by restraining the market for NCAA Division II student-athletes by precluding Petitioner and other similarly situated Division II student-athletes who enrolled in JUCOs from having an opportunity to earn NIL Compensation and earning a degree while playing four years of a sport at the NCAA Division II level.

60.    Specifically, the 10-Semester/15-Quarter Rule violates the Sherman Act by starting each athlete's Eligibility Clock while the athlete is attending non-NCAA institution. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the

_____

[6] "**Waiver:** An action that sets aside an NCAA rule because a specific, extraordinary circumstance prevents you from meeting the rule. _An NCAA school must file a waiver on your behalf; you cannot file a waiver for yourself_. The school does not administer the waiver; the conference office or NCAA does." (Emphasis added).

JUCO level as reasonably commensurate with the competition and opportunities afforded at an NCAA institution.

## E.   THE "RULE OF RESTITUTION": NCAA BYLAW 14.1.3.2.2

61.    If the Court grants Petitioner injunctive relief, it must also address NCAA Bylaw 14.1.3.2.2, commonly known as the "Rule of Restitution," which provides, in pertinent part:

> **14.1.3.2. Restitution**. If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions….

**Exhibit F**.

62.    If the Court grants Petitioner injunctive Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id.* To make a temporary restraining order and preliminary injunction meaningful in this case, Petitioner respectfully requests that the Court enjoin the NCAA's application of the Rule of Restitution against Petitioner, Miles College, or any other Division II institution because its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *State of Ohio*, 706 F.Supp.3d at 601.

## F.   RELEVANT MARKETS.

63.    The JUCO Eligibility Limitation Bylaws affects the labor market for college basketball athletes in general and NCAA Division II basketball specifically. Within this market, student athletes

like Petitioner compete for roster spots on Division II basketball teams and those NCAA Division II colleges compete against each other to recruit the best college athletes to compete on their athletic teams.

64.    The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

65.    When the NCAA lifted the restriction on NIL compensation in June 2021, rules regulating who can play (*i.e.,* who can enter the labor market for NCAA Division II basketball) became "commercial in nature." As the court in *Tennessee v. Nat'l Collegiate Athletic Ass'n*, explained, "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756 (E.D. Tenn. 2024). And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature. *See also, Ohio,* 706 F. Supp. 3d at 591 (restrictions on a student-athlete's ability to play are a restraint on trade and subject to the Sherman Act); *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (finding the NCAA's argument that rules prohibiting student-athletes from accepting prize money are non-commercial eligibility requirements that are not subject to the Sherman Act was "unlikely to be successful").

66.    Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college basketball players. Namely, these transactions include partial or full scholarships in exchange for the college

athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

67.    The commercial nature of NCAA's eligibility rules trigger application of the Sherman Act and subject such rules to further scrutiny to determine whether they are an undue restraint on trade.

## G. ANTICOMPETITIVE EFFECTS

68.    The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division II college sports.

69.    The NCAA and its member institutions adopt these rules, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division II student athletes.

70.    Despite what the NCAA may claim, the JUCO Eligibility Limitation Bylaws restrain college athletes from improving their economic opportunity, personal growth, and well-being with NIL opportunities, through a full four-year college playing experience, a freedom afforded to all athletes who enroll at NCAA Division II members as freshman, but not to JUCO student athlete transfers. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college basketball players and consumers of college basketball.

71.    In essence, the JUCO Eligibility Limitation Bylaws amount to no more than an agreement to limit the amount of time athletes may play Division II basketball because they have

chosen to attend a non-NCAA institution prior to transferring to a NCAA Division II institution. These same restrictions are not placed on athletes who choose to delay entry to a NCAA Division II institution to attend prep school, serve in the military, or even to compete professionally in another sport.

72.    The JUCO Eligibility Limitation Bylaws harm JUCO and former JUCO student athletes in four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a JUCO after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a JUCO; (3) when an athlete is deciding whether to attend a JUCO for a second year or transfer to an NCAA Division II institution; and (4) when an athlete has transferred from a JUCO to a NCAA Division II institution and has his/her eligibility limited to two or three years.

73.    First, the JUCO Eligibility Limitation Bylaws harms athletes when they are deciding what to do after graduating from high school. Upon graduating from high school, an athlete can choose between several options including, but not limited to, attending a NCAA Division II institution, attending a JUCO, going to prep school, joining the military, playing a professional sport, or taking a gap year or non-sport job. All those options provide the possibility of the athlete competing for four plus years at a NCAA Division II institution except one: going to a JUCO.

74.    The challenged rules limit the NCAA Division II eligibility of student-athletes who attended JUCOs to two or three seasons while student-athletes who attend only NCAA Division II institutions have four years of Division II eligibility. This Rule gives a competitive advantage to NCAA Division II member schools over JUCOs – and thus the basketball players at each level – even though they are treated the same in terms of eligibility. The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division II basketball players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of

NCAA Division II eligibility even if JUCO might otherwise be a better choice academically or athletically. Similarly, students who attend JUCO for one year and are considering whether to continue their JUCO education and obtain an associate degree or transfer to an NCAA Division II institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeiture of NCAA eligibility and associated NIL opportunities for JUCO attendance discounts that choice.

75. NCAA Division II member institutions compete directly with NJCAA schools for basketball talent. NCAA Division II offers a prospective basketball player significant advantages over JUCO basketball – more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately available to Division II athletes.

76. The JUCO Eligibility Limitation Bylaws induce potential basketball players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as JUCOs, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a JUCO or an NCAA institution.

77. The JUCO Bylaw Limitations deny these benefits to former JUCO college athletes for one to two seasons. The lost opportunity that comes with missing an entire college athletics season is significant, as the lost time and economic opportunity cannot be easily remedied. For athletes in the market to provide athletic services in Division II basketball, the impact of a missed season is even more pronounced in its effect on the student athletes' future earning potential. Each game missed is a lost opportunity to showcase a college athlete's skills and personalities to audiences, scouts, businesses and brands. Each season of missed competition causes immeasurable and irreparable harm to college athletes like Petitioner.

**H. LACK OF PROCOMPETITIVE JUSTIFICATION**

**78.** Because the above demonstrates the anti-competitive effect of the JUCO Eligibility Limitation Bylaws on the Division II labor market for basketball players, like Petitioner, and the consumer market for persons watching college basketball, the burden shifts to the NCAA to prove a procompetitive justification for the JUCO Eligibility Limitation Bylaws.

**79.** Based on its historical arguments, the NCAA may offer two potential justifications for the JUCO Eligibility Limitation Bylaws. First, the NCAA may argue the JUCO Eligibility Limitation Bylaws promote the academic well-being of college athletes. Second, the NCAA may argue the JUCO Eligibility Limitation Bylaws preserve the amateurism model of the NCAA. Both arguments are pretextual.

**80.** In guidance to college athletes on the transfer process, the NCAA has stated that its Eligibility Clock is "designed to move student-athletes toward graduation in a timely manner." *See,* **Exhibit C**, p. 21. But starting a JUCO athlete's Eligibility Clock before the student athlete even arrives on the NCAA member institutions campus does nothing to help an athlete earn his degree. The NCAA does not mandate how many transfer credits from a JUCO that each member institution must accept. In fact, the NCAA does not even mandate how many transfer credits a Division I institution must accept from a Division II institution.

**81.** Furthermore, the JUCO Eligibility Limitation Bylaws do not aid the NCAA in maintaining consumer interest through its "amateurism model" as distinct from professional sports. As an initial matter, the NCAA has never developed a cohesive, coherent, or consistent definition of "amateurism." Regardless, nothing in the JUCO Eligibility Limitation Bylaws affects the amateur status of college athletes as referenced in the NCAA Bylaws.

82.    A JUCO basketball player is merely transferring from one school as an amateur athlete to another school as an amateur athlete. Preventing college athletes from competing in NCAA basketball games solely because they decided in their own best interest to start college at a non-NCAA institution has no relationship with the amateur status of those athletes. Any NCAA arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

83.    Additionally, as a matter of law, supposed benefits in the market for *consumers* of college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student athlete *labor*. Accordingly, any supposed consumer desire for college athletes to complete all post-graduate education within four or five years (of which the NCAA has presented no evidence) cannot balance against the harm caused to those students through elimination of their ability to earn NIL Compensation. Instead, the NCAA must show that the bylaws have a pro-competitive effect in the damaged market; in this case, the *labor* market for Division II college basketball players. Regardless, even if this cross-market balancing was legally cognizable, the JUCO Eligibility Restriction Bylaws have nothing to do with college athletes maintaining amateur status.

84.    Even if the academic and amateurism goals of the NCAA were valid procompetitive justifications (and they are not), both goals could be accomplished through less restrictive alternatives, some of which are already in place within the NCAA bylaws. For example, NCAA Division II Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. Other NCAA Division II Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the JUCO Eligibility Limitation Bylaws.

85.    Additionally, minor revisions to the JUCO Eligibility Limitation Bylaws themselves could maintain any procompetitive intent by the NCAA without damaging JUCO athletes. For instance, the start of the Eligibility Clock could be triggered based on when the athlete first registered for classes at "an **NCAA member** institution" instead of when they register at a "**collegiate** institution" as in the current bylaws. Likewise, the definition of "Intercollegiate Competition" could be changed to reference when an athlete is "in a **NCAA member** institution" as opposed to "in either a **two-year or a four-year collegiate** institution" as in the current bylaws.

## COUNT ONE:
### (Violation of § 1 of the Sherman Act)

86.    Petitioner repeats and realleges each allegation set forth in the preceding paragraphs as though fully set forth herein.

87.    The NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the JUCO Eligibility Limitation Bylaws: NCAA Division II Bylaw 14.4.3 and 14.4.3.2 (the 10-Semester/15-Quarter Rule) and 14.02.12 (the Intercollegiate Competition Rule). Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division II student athletes who transfer to the NCAA from a non-NCAA institution to play for the same number of years offered to every other student athlete. The restraint imposed by the JUCO Eligibility Limitation Bylaws cannot withstand analysis under the rule of reason.

88.    The market for college basketball athletes, specifically Division II basketball, is the relevant antitrust market. The transactions between NCAA member institutions and college basketball players in this market are commercial in nature and fall under the purview of the Sherman Act.

89.    This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of a JUCO transfer, like Petitioner, for the four or five years they are permitted to retain the services of other college basketball players. This limitation disadvantages JUCO basketball players seeking to transfer to an NCAA Division II institution along with former JUCO basketball players currently playing for an NCAA Division II institution, and prevents such basketball players from realizing the benefits of competing in NCAA Division II basketball games for the same length of time available to all other college basketball players, harming their current and future earning potential.

90.    As a direct result of Defendant's conduct, JUCO basketball players seeking to transfer to an NCAA Division II college along with former JUCO basketball players currently playing for an NCAA Division II college basketball and consumers of college athletics have suffered and continue to suffer antitrust injury due to the reduction in competition among Division II schools for college athletes through the restrictions imposed by the JUCO Eligibility Limitation Bylaws.

91.    The JUCO Eligibility Limitation Bylaws yield few, if any, benefits to competition in Division II college basketball to the NCAA's member institutions, to college basketball players, or to consumers of NCAA Division II basketball games contests. Any such benefits are far outweighed by the harm to competition and to the college basketball players who are subject to the JUCO Eligibility Limitation Bylaws. Furthermore, the NCAA bylaws already contain less restrictive alternatives that accomplish the NCAA's goals for the JUCO Eligibility Limitation Bylaws and/or such Bylaws could be easily modified to address such concerns.

92.    Defendant's conduct is ongoing and will continue to impose injury on current and former JUCO basketball players and consumers of college basketball unless injunctive relief is

granted. This ongoing harm from the JUCO Eligibility Limitation Bylaws has caused, and continues to cause, direct harm to Petitioner by restricting his ability to play Division II basketball beyond the 2024-2025 basketball season and limiting his future opportunities to showcase his skills, talent, and personality and does so as an unreasonable restraint on the labor markets for college basketball players.

93.     The NCAA and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

94.     Petitioner asks for a preliminary and permanent injunction enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 14.4.3, 14.4.3.2, and 14.02.12 as to Petitioner, and from enforcing NCAA Bylaw 14.1.3.2.2 to punish Petitioner, Miles College, and any other NCAA Division II member institution for actions taken in compliance with any orders from this Court. Petitioner also asks the Court to explicitly rule that he is eligible to play Division II college basketball in the 2025-2026 academic year.

<u>**SECURITY**</u>

95.     Federal Rule of Civil Procedure 65(c) requires a party moving for a preliminary injunction to post security to protect the other party from any financial harm likely to be caused by a temporary injunction if the injunction is later overturned.

96.     Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," including the discretion to require no bond at all. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,* 636 F.2d 1084, 1094 (5th Cir. 1981); *Steward v. West,* 449 F.2d 324. 325 (5th Cir. 1971) (finding that no injunction bond need be posted when "it is very unlikely that the defendant will suffer any harm").

97.    The NCAA will suffer no compensable costs or damages by halting enforcement of its JUCO Eligibility Rules as it relates to Petitioner during the pendency of this litigation. As a result, no security is needed.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1. Adjudge and decree that Defendant's enforcement of NCAA Bylaws 14.4.3, 14.4.3.2, and 14.02.12 violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 14.4.3, 14.4.3.2, and 14.02.12 as to Petitioner, and from enforcing NCAA Bylaw 14.1.3.2.2 to punish Petitioner, Miles College, and any other NCAA Division II member institution for actions taken in compliance with any orders from this Court;

3. Award Petitioner additional NCAA Division II competition and eligibility to take place in 2025-26 to avoid harm caused by NCAA Bylaws 14.4.3, 14.4.3.2, and 14.02.12;

4. Adjudge and decree that Defendant's enforcement of the competition limitations in the NCAA Bylaws 14.4.3, 14.4.3.2, and 14.02.12 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

5. Award Petitioner his costs, including reasonable attorneys' fees; and

6. Order any other relief that this Court deems just and proper.

RESPECTFULLY SUBMITTED:

**BREAZEALE, SACHSE & WILSON, L.L.P.**

_____*s/ David C. Fleshman*_____
David C. Fleshman, La. Bar Roll No. 34382
Alexandra C. Hains, La. Bar Roll No. 35086
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Fax: 225-387-5397
david.fleshman@bswllp.com
alex.hains@bswllp.com
*Attorneys for Rylen Walker*

5298536